IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Reed McCormick,<br>        Appellant | : |
| | : |
| | : |
| v. | : No. 996 C.D. 2015 |
| | : Submitted: June 3, 2016 |
| Commonwealth of Pennsylvania, | : |
| Department of Transportation | : |


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE DAN PELLEGRINI, Senior Judge


<u>OPINION NOT REPORTED</u>


MEMORANDUM OPINION BY
SENIOR JUDGE PELLEGRINI              FILED: July 11, 2016


        Reed McCormick (Condemnee) appeals from the May 14, 2015 order of the Court of Common Pleas of Centre County (trial court) sustaining the preliminary objections of the Commonwealth of Pennsylvania, Department of Transportation (PennDOT) to Condemnee's petition for the appointment of a board of viewers (Petition) filed pursuant to Section 502 of the Eminent Domain Code, 26 Pa. C.S. §502. The issue in this case is whether there was a *de facto* taking of the property before PennDOT filed its formal declaration of taking. For the following reasons, we affirm.

**I.**

Condemnee is the owner of the Skytop Vista development property located in Centre County, Pennsylvania, as recorded via deed dated April 11, 1979. In October 2001, PennDOT began construction of a four-lane limited access highway known as I-99 in close proximity to Condemnee's property. As part of the project, PennDOT sought and obtained temporary easements for construction purposes (TCEs) from both Condemnee and nearby property owner Willard E. Rearick (Rearick).[1] PennDOT then constructed Pond M on these two TCEs, which was intended to be a temporary facility placed in a stream known as Buffalo Run for the purpose of erosion and sediment pollution control from the I-99 project.

Both of the TCEs contain the following release relating to damages under the Eminent Domain Code for or by reason of the I-99 construction:

> The OWNER does further remise, release, quitclaim, and forever discharge the COMMONWEALTH or any agency or political subdivision thereof or its or their employees or representatives of and from all suits, damages, claims, and demands which the OWNER might otherwise have been entitled to assert under the provisions of the Eminent Domain Code, Act of June 22, 1964, P.L. 84, as amended, 26 P.S. 1-101 et seq., for or on account of any injury to or destruction of the aforesaid property of the OWNER, through or by reason of the construction or improvement, except damages, if any, under Section 610 (Limited Reimbursement of Appraisal, Attorney, and Engineering Fees) and Section 610.1

---

[1] Condemnee's property was designated on PennDOT acquisition documents as Parcel 222, and Rearick's property was designated as Parcel 226.

2

(Payment of Account of Increased Mortgage Costs) of the Eminent Domain Code; provided, however, that if relocation of a residence or business or farm operation is involved, this release shall likewise not apply to damage, if any, under Section 610-A(a) (Moving Expenses) and/or Section 603-A (Replacement Housing) of Eminent Domain Code.

(Reproduced Record (R.R.) at 713a, 1009a.)

PennDOT admits that following commencement of the I-99 construction, the TCE on Parcel 222 was physically extended by 0.095 acres, or 4,417 feet, onto Condemnee's property in order to lengthen a stormwater half-pipe[2] along the steep slope area above Pond M.[3] After this extension and after PennDOT commenced using both TCE areas, Condemnee acquired from Rearick 2.67 acres of land from Parcel 226. The entire TCE area owned by Rearick was transferred to Condemnee as part of this transaction, including the area of Parcel 226 encumbered by Pond M. This deed was recorded on July 5, 2006. Among the listed encumbrances, the deed specifically indicated that the property was subject to the existing TCE benefitting PennDOT, stating:

UNDER AND SUBJECT to a temporary construction easement over a major portion of the herein described parcel, north of Mattern Lane, as shown on plans for

---

[2] This stormwater half-pipe is also referred to in the record as structure DC-21.

[3] The parties stipulated to these facts and they are not contested on appeal.

3

construction of State Route 6220[4] Section A121 and State Route 3042.

(R.R. at 732a.)

At some point during the I-99 project, PennDOT became aware of an acid rock drainage (ARD) issue due to the presence of pyritic sandstone in the construction zone. PennDOT then allegedly began using Pond M on Condemnee's property to gather, treat and remediate the ARD pollution caused by the I-99 project. According to Condemnee, this use of his property by PennDOT for pollution control rendered his land unusable and dangerous. Therefore, on October 8, 2009, Condemnee filed a petition for appointment of a board of viewers alleging a *de facto* taking of his property by PennDOT in the area of Pond M. Condemnee asserted that the taking commenced around December 15, 2003, and was still ongoing. Condemnee also asserted that this use of his property was not part of the TCEs because the easement was specifically limited to erosion and sedimentation, not pollution control; therefore, the use was unauthorized and not covered by the release.

On November 9, 2009, PennDOT filed preliminary objections asserting the following: no *de facto* taking could occur because all of the PennDOT activities complained of were within the scope of the TCE and release; Condemnee's waiver of liability was voluntarily given; and Condemnee was bound

---

[4] State Route 6220 is also known as I-99.

by the release and waiver given to PennDOT by Rearick, the record owner of Parcel 226 at the time of the conveyance.

In an ancillary matter, on December 11, 2009, PennDOT filed a formal declaration of taking asserting a partial taking of property owned by Condemnee for the purpose of constructing a permanent pollution mitigation site for the land adversely affected by its proximity to I-99. Condemnee filed preliminary objections to the declaration of taking alleging that the property had already been acquired through a *de facto* taking. On February 19, 2010, PennDOT filed a motion to dismiss the preliminary objections and a motion for writ of possession alleging that Condemnee had applied for the payment of just compensation. Condemnee subsequently acknowledged acceptance of just compensation.

Following a hearing, the trial court entered orders dismissing Condemnee's preliminary objections, granting possession of the land to PennDOT and enjoining Condemnee from obstructing PennDOT's use of the premises. Condemnee appealed to this Court and we affirmed the trial court's orders in an unreported opinion.[5] Condemnee's petition for allowance of appeal to the Supreme Court of Pennsylvania was denied by order dated September 26, 2011.

---

[5] *See In Re: Condemnation by the Commonwealth of Pennsylvania, Department of Transportation of Right-of-Way for State Route 6220, Section C12, a Limited Access Highway in the Townships of Huston and Patton*, (Pa. Cmwlth., No. 1091 C.D. 2010, filed December 6, 2010).

The case then returned to the trial court for consideration of the within matter – Condemnee's allegation of a *de facto* taking. Following extensive discovery and two evidentiary hearings, the trial court held that a *de facto* condemnation took place with respect to the additional 4,417 square feet of Condemnee's property acquired to lengthen the stormwater half-pipe, and appointed a board of viewers for the determination of damages in accord with the provisions of the Eminent Domain Code. However, it found that a *de facto* taking had not occurred with regard to the other parcels. The trial court's order states, in pertinent part:

> 1.     The Commonwealth's Objection to the inclusion of Parcel 226 is SUSTAINED as Plaintiff was not the record owner of the Parcel as of the date of the alleged De Facto Taking.
>
> 2.     The Commonwealth's Objection to any de facto taking as a result of acid rock drainage mitigation use in the temporary construction easement areas with respect to either Parcel 226 or Parcel 222 (except as otherwise set forth herein) is SUSTAINED as said use was a result of construction activity within the scope of the temporary construction easements and is thereby bared [sic] by the releases contained in the documents of title introduced herein.
>
> 3.     The Court accepts the Stipulation of the parties regarding the physical extension of structure DC-21. Said Stipulation acknowledges that the existing TCE was physically extended by 4,417 square feet on October 3, 2001.

(R.R. at 219a.)  This appeal followed.[6]

## II.

Condemnee first argues that the trial court erred in determining that the release language contained in the TCEs for Parcels 222 and 226 was sufficiently broad to cover use of the property for pollution control.  According to Condemnee, the release language was explicitly limited to erosion and sediment (E&S) control; therefore, he could not have known that PennDOT intended to use the land for ARD management.  Condemnee also asserts that PennDOT itself was not aware of the ARD until September 2003, two to three years after entering into the TCEs.

We recognize the well-established principle that such releases "must be construed strictly 'so as to avoid the ever present possibility that the releaser may be overreached.'"  *Finsel v. Commonwealth of Pennsylvania, Department of Highways*, 349 A.2d 785, 786 (Pa. Cmwlth. 1975) (quoting *Restifo v. McDonald*, 230 A.2d 199, 201 (Pa. 1967)).  In addition, "a release may cover only such matters as can fairly be said to be within the contemplation of the parties when executed."  *Mancia v. Commonwealth of Pennsylvania, Department of Transportation*, 517 A.2d 1381, 1384 (Pa. Cmwlth. 1986) (citations omitted).  Nonetheless, we have repeatedly held that similar language in releases executed

---

[6] Our review of a trial court's ruling on preliminary objections to a petition for appointment of a board of viewers is limited to determining whether necessary findings are supported by substantial evidence and whether the trial court committed an error of law.  *Ristvey v. Commonwealth of Pennsylvania, Department of Transportation*, 52 A.3d 425, 429 n.3 (Pa. Cmwlth. 2012).

7

with PennDOT was sufficiently specific and within the contemplation of the parties so as to completely bar condemnees' claims for damages under the Eminent Domain Code. *See Mancia*, 517 A.2d at 1384; *Thomas v. Commonwealth of Pennsylvania, Department of Transportation*, 398 A.2d 1076, 1078 (Pa. Cmwlth. 1979); *Susterick v. Commonwealth of Pennsylvania, Department of Transportation*, 374 A.2d 749, 751 (Pa. Cmwlth. 1977); *Finsel*, 349 A.2d at 787; *Seitz v. Commonwealth of Pennsylvania, Department of Transportation*, 296 A.2d 280, 282 (Pa. Cmwlth. 1972).

The trial court found that use of the TCEs areas for ARD management was within the scope of the general releases and contemplated by the parties. It based that conclusion on the testimony of Professional Engineer David Galeone, who testified on behalf of PennDOT as an expert witness in interstate highway design as well as the highway design engineer for I-99, beginning in 1998. He testified that PennDOT prepared an Erosion and Sediment Pollution Control Plan as part of the I-99 project, and this plan included a drainage basin referred to as Pond M. He also testified that ARD management due to the presence of pyrite in the construction zone was part of the design as well as the final plans provided as part of the construction bid package submitted in 2000. Marv Klinger, an expert in the field of environmental science whose work on the I-99 project began in 1992, testified that PennDOT was aware of the presence of potential pyrite-bearing areas in the construction zone prior to the initiation of construction. Mr. Klinger testified that PennDOT was required and did, in fact, obtain a national pollution discharge elimination system (NPDES) permit from the Department of Environmental Protection allowing Pond M to be used for ARD management. Mr. Klinger also

8

prepared and testified regarding an ARD timeline with respect to the I-99 project, spanning from 1992 to March 2010.

Condemnee offered the testimony of Wayne Engle, a professional land surveyor; however, Mr. Engle admitted that he had no experience in designing interstate highway facilities and did not have any engineering background or training. On cross-examination, Mr. Engle acknowledged that both the NPDES permit and the E&S plan addressed pollutants from the I-99 project. Condemnee himself testified as to his observations around the construction zone and Pond M. He also testified that he believed he only granted PennDOT TCEs for E&S control and not pollution or ARD management. However, a condemnee's subjective understanding of the ramifications of his settlement, by itself, is not conclusive. *See Thomas*, 398 A.2d at 1078-79. Moreover, "the resolution of conflicts in evidence and determination of the credibility of witnesses in eminent domain cases are properly within the lower court's province." *Id.* at 1079.

We have repeatedly held that at the time of the conveyance, condemnees are "confronted with the not unusual, difficult problem which confronts all who are contemplating accepting a settlement for the damages due to an eminent domain taking. They had to visualize, difficult as it might be, all the damages to which they might be entitled by virtue of that taking." *Seitz*, 296 A.2d at 282; *see also Finsel*, 349 A.2d at 786. As such, the record here clearly demonstrates that Condemnee should have been aware of the potential for ARD at the time of the conveyance. Given all of the above, we find no error in the trial court's determination that the release language contained in the TCEs was

9

sufficiently broad to cover use of the property for pollution control and that this use was or should have been contemplated by the parties.[7]

## III.

Condemnee also alleges that the trial court erred in finding that he was precluded from establishing a *de facto* taking with respect to Parcel 226 because he was not the record owner of the parcel at the time of the taking. This argument is without merit. We have repeatedly held that a general release from all damages under the Eminent Domain Code executed by a predecessor in interest bars a condemnee's present claim for damages or injury found to be within the scope of the project. *See Mancia*, 517 A.2d at 1384; *Susterick*, 374 A.2d at 750; *Finsel*, 349 A.2d at 786-87. The releases contained in the TCEs for Parcels 222 and 226 are identical, and it is undisputed that Condemnee did not own Parcel 226 at the time the TCEs were executed. Moreover, there is no evidence in the record to support Condemnee's assertion that the taking did not occur until 2003, several years after the TCEs were executed. Finally, Condemnee was aware of the release given by Rearick to PennDOT as the encumbrance was specifically listed in the chain of title for Parcel 226. The release was contained in the recorded deed from Rearick to PennDOT, and Condemnee's own subsequent deed from Rearick expressly stated that the transfer was subject to PennDOT's TCEs "as shown on plans for construction of [I-99] Section A121 and State Route 3042." (R.R. at 732a.)

---

[7] A party seeking to set aside a release may also do so by establishing fraud, duress or deception by PennDOT through clear, precise and convincing evidence. *Mancia*, 517 A.2d at 1383. Condemnee has not even alleged, let alone sufficiently proven, any of these grounds; therefore, they will not be addressed.

10

Accordingly, the order of the trial court is affirmed.


_____
DAN PELLEGRINI, Senior Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Reed McCormick, | : | |
| Appellant | : | |
| | : | |
| v. | : No. 996 C.D. 2015 |
| | : | |
| Commonwealth of Pennsylvania, | : | |
| Department of Transportation | : | |

# **O R D E R**

AND NOW, this 11<u>th</u> day of <u>July</u>, 2016, the order of the Court of Common Pleas of Centre County in the above-captioned matter, dated May 14, 2015, is hereby affirmed.

_____
DAN PELLEGRINI, Senior Judge

Reed McCormick, : 
           Appellant : 
: No. 996 C.D. 2015
           v. : 
: Submitted: June 3, 2016
Commonwealth of Pennsylvania, : 
Department of Transportation : 


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE DAN PELLEGRINI, Senior Judge


***OPINION NOT REPORTED***


DISSENTING OPINION BY
JUDGE McCULLOUGH                       FILED: July 11, 2016


I respectfully dissent because I do not believe that the release language included by the Commonwealth of Pennsylvania, Department of Transportation (PennDOT) in the temporary construction easements (TCEs) obtained from Reed McCormick (Condemnee) and neighboring landowner Willard E. Rearick was sufficient to encompass remediation of an acid rock drainage (ARD) issue.

As the Majority notes, PennDOT obtained the necessary TCEs from Condemnee and Rearick in relation to the construction of a four-lane limited access highway known as I-99. After obtaining the TCEs, PennDOT constructed Pond M, which was intended as a temporary facility placed in a stream known as

Buffalo Run for the limited purpose of erosion and sediment pollution control from the I-99 project. Upon discovery of the ARD issue, PennDOT began using Pond M on Condemnee's property to gather, treat, and remediate the ARD pollution, the result of which allegedly left Condmenee's land unusable and dangerous and precipitated Condemnee's filing of a petition for appointment of viewers asserting that PennDOT had effectuated a *de facto* taking of his property. PennDOT filed preliminary objections contending that all of its activities were within the scope of the TCEs and releases, to which Condemnee was bound. The trial court agreed, concluding that the ARD mitigation use "was a result of construction activity within the scope of the [TCEs] and is thereby bared [sic] by the releases" contained therein. (Reproduced Record (R.R.) at 219a.)

The Majority affirms the trial court decision, noting that Condemnee should have been aware of the potential for ARD at the time he executed the TCE. The Majority relies on several cases which held that similar language in other PennDOT releases "was sufficiently specific and within the contemplation of the parties so as to completely bar condemnees' claims for damages under the Eminent Domain Code[1]." (Slip op. at 7.) However, I disagree with the Majority that Condemnee should have, or could have, anticipated the possibility of ARD pollution, and any resultant damage to his property, at the time he executed the TCE. Further, I believe the cases relied on by the Majority are distinguishable, as, unlike the present case, the potential damage in those cases was foreseeable.

For example, in *Mancia v. Commonwealth of Pennsylvania, Department of Transportation*, 517 A.2d 1381 (Pa. Cmwlth. 1986), the landowners complained of drainage damage but the record established that the landowners had

---

[1] 26 Pa.C.S. §§101 – 1106.

reviewed construction plans, discussed damages with a PennDOT negotiator, and signed a planning sheet showing the drainage changes, which included replacement of a twelve-inch drainage pipe with an eighteen-inch drainage pipe. Additionally, the release signed by the landowners in *Mancia* specifically referenced drainage issues. In *Thomas v. Commonwealth of Pennsylvania, Department of Transportation*, 398 A.2d 1076 (Pa. Cmwlth. 1979), while the issue was really one of fraudulent misrepresentation by PennDOT in procuring an easement and release, we noted that the landowners in that case had "executed and delivered a plot plan attached to the deed of easement which indicated the area to be affected and stated in part that the plan had been examined and explained to them." *Id.* at 1077.

In *Susterick v. Commonwealth of Pennsylvania, Department of Transportation*, 374 A.2d 749 (Pa. Cmwlth. 1977), the landowners complained of damage to their property from debris, water, and ice falling from a bridge, but the record included an appraisal report from a Commonwealth engineer, which appears to have been submitted to the prior landowner in the course of obtaining an easement and release, that specifically identified the possibility of damage of this nature. In *Finsel v. Commonwealth of Pennsylvania, Department of Highways*, 349 A.2d 785 (Pa. Cmwlth. 1975), the landowners complained of flooding damage caused by water runoff after PennDOT widened and upgraded an existing highway that crossed their property. We held that the release signed by the landowners "discharges *all claims under the Eminent Domain Code*" and "most certainly contemplates all indirect and consequential damages which might result from the highway improvements, such as surface water runoff." *Id.* at 787 (emphasis in original).

Finally, in *Seitz v. Commonwealth of Pennsylvania, Department of Transportation*, 296 A.2d 280 (Pa. Cmwlth. 1972), the landowners complained of damage to their property from cars careening off a recently-improved highway with a redesigned curve. The landowners noted that PennDOT changed the grade of the highway during construction which resulted in an increase in the speed of traffic traveling the highway. However, the record indicated that a change in the grade and a redesigned curve were part of the original plans approved by the Governor and that, at the time the release was signed, the reconstruction of the highway was underway and it was nearly complete by the time the landowners received their payment from PennDOT for a partial taking of their land.

In the present case, while the release was broadly worded to include "all suits, damages, claims, and demands which the OWNER might otherwise have been entitled to assert under the provisions of the Eminent Domain Code," (R.R. at 713a, 1009a), it appears that both PennDOT and Condemnee only envisioned using Pond M on the TCEs for the purpose of erosion and sediment control, and not to remediate ARD pollution. Although the cases discussed above cite the difficult decision that a landowner must face in contemplating a settlement for damages related to a taking via eminent domain, i.e., trying to visualize all of the damages to which they might be entitled by virtue of the taking, I simply cannot envision a landowner in the position of Condemnee reasonably foreseeing potential damage to his property resulting from remediation of an ARD pollution issue. Indeed, the cases cited above also state that these types of releases "must be construed strictly," *Finsel*, 349 A.2d at 786, and that "a release may cover only such matters as can fairly be said to be within the contemplation of the parties when executed." *Mancia*, 517 A.2d at 1384.

For these reasons, I would reverse the order of the Court of Common Pleas of Centre County sustaining PennDOT's preliminary objections to Condemnee's petition for the appointment of a board of viewers asserting a *de facto* taking.

 

_____
PATRICIA A. McCULLOUGH, Judge